John R. Clemency (009646)
Lindsi M. Weber (025820)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road, Suite 1100
Phoenix, Arizona 85016
Phone:      (602) 530-8346
Facsimile:  (602) 530-8500
E-mail:     john.clemency@gknet.com
            lindsi.weber@gknet.com
*Proposed Attorneys for Debtor*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>N'GENUITY ENTERPRISES CO.,<br><br>Debtor. | Chapter 11 Proceedings<br><br>Case No. 2:14-bk-11553<br><br>**DECLARATION OF VALERIE M. LITTLECHIEF IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND EARLY CASE FILINGS** |

This Declaration is filed by Valerie M. LittleChief on behalf of N'Genuity Enterprises Co. ("N'Genuity" or "Debtor") in connection with the voluntary Chapter 11 bankruptcy case of N'Genuity.

I, Valerie M. LittleChief, declare as follows under penalty of perjury under the laws of the United States of America:

1. I am the President and founder of N'Genuity. My office is located at N'Genuity's headquarters in Scottsdale, Arizona. I am familiar with the operations of N'Genuity, including the day-to-day operations, business affairs, books and records, and rules and regulations, including federal contractor compliance rules and regulations, applicable to N'Genuity and its employees as a U.S. Government prime contractor and sub-contractor.

2. On July 28, 2014, N'Genuity filed a voluntary petition for relief under

Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"). N'Genuity continues in possession of its property and the management of its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3. To enable N'Genuity to operate more effectively and efficiently, and to avoid the adverse effects of its Chapter 11 filing, various types of relief are requested in "first day" motions filed with the Court along with this Declaration.

4. I submit this Declaration in support of the first day motions and the voluntary petition filed by N'Genuity. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant first day motion. Except as otherwise indicated, all facts stated in this Declaration are based upon my personal knowledge, my review of the relevant documents, or my opinion based upon my experience and knowledge of the business operations and financial affairs of N'Genuity, and the rules and regulations applicable to N'Genuity. If I am called upon to testify, I could and would testify as follows to the facts set forth herein. I am authorized to submit this Declaration on behalf of N'Genuity.

## **Background**

5. N'Genuity offers quality food products and exemplary service while providing socio-economic benefits to our vast client base within the food service industry.

6. N'Genuity's certifications include:
- U.S. Small Business Administration Small Disadvantaged Business (SDB) Certified
- U.S. Small Business Administration Woman Owned Business (WOB)
- U.S. Small Business Administration Native American Business
- Department of Defense (DoD) Registered
- Central Contractor Registration (CCR)

        - MPA Approved Supplier

7. N'Genuity offers customers the very finest protein products available in the market. All of its products are produced in USDA-approved facilities that have earned numerous industry awards.

8. N'Genuity utilizes a series of programs that monitor both environment and finished product to ensure the highest quality of products.

9. N'Genuity offers a "Signature Product" for its customers, understanding that each customer's needs are unique. The ability to provide precision portion-control, while maintaining the ability to ship coast-to-coast and internationally in an expeditious manner is what sets N'Genuity apart.

10. N'Genuity products are available:
- Portioned
- Commodity
- RTC
- Fully Cooked
- Bulk

11. N'Genuity sells the majority of its products through two channels. One channel is as a prime contractor for United States Military agencies. N'Genuity has contractual relationships with many government entities for the purchase and service of its products. The primary channel involves N'Genuity subcontracting with other prime government contractors to U.S. Military agencies.

12. N'Genuity gets a competitive advantage from SBA, which is vital to the success of the company. This special status under SBA programs is critical to N'Genuity's continued success because it provides many advantages that allow N'Genuity to successfully bid on government contracts and subcontracts.

13. The majority of N'Genuity's business operations are conducted from its

leased commercial space in Scottsdale, Arizona.  N'Genuity's primary operations are located at 8901 E. Pima Center Parkway, Suite 135, Scottsdale, Arizona 85258.

### N'Genuity's Ownership Structure

14. N'Genuity is an Arizona corporation, incorporated in 2001.  I am the majority shareholder of N'Genuity, I serve as its President and Chief Executive Officer, and I am one of three directors for the company.

15. Vincent Jackson holds a minority interest in the company.

### N'Genuity's Management Team

16. <u>Valerie M. LittleChief - President and Founder.</u>  I am a Native American woman of the Kiowa and Comanche nation, and have long nurtured a vision of a community-responsive business organization based on a philosophy of diversity.

17. Founding N'Genuity Enterprises was a vehicle for my entrepreneurial spirit. Since its inception, the company has developed into a uniquely diverse entity with exponential growth opportunities. Building a solid foundation within the food services industry is a direct result of both my hard work, dedication and the thirst for knowledge, and that of N'Genuity's staff.

18. I was raised in Las Vegas and moved to Arizona in 1982.  I am married with one child and reside in Scottsdale, Arizona.

19. I have been a member of the National Association of Women Business Owners (NAWBO), the American Indian Chamber of Commerce (AICC of AZ), and the California Nations Indian Gaming Association (CNIGA).

20. <u>Dustin Bowen-Director and Member of the Sales and Marketing Team</u>. Dustin is my son-in-law who has been a vital part of the sales and marketing team with N'Genuity for approximately the last dozen years.  Dustin also has served as a director of N'Genuity since 2009.

21. <u>Bub Bowen-Member of Sales and Marketing Team</u>.  Bub Bowen, my

husband and Dustin's father, has been involved with N'Genuity since the company's inception in 2001. Bub knows most aspects of the business, and is a vital part of the sales and marketing effort for N'Genuity, particularly sales and marketing to overseas customers.

**Facilities and Employees**

22. The majority of N'Genuity's business operations are conducted from its leased commercial space in Scottsdale, Arizona. N'Genuity's primary facility is located at 8901 E. Pima Center Parkway, Suite 135, Scottsdale, Arizona 85258.

23. N'Genuity is supported by Chad Bowen and Cindy Eddy, who handle a large portion of the logistical needs of the company. N'Genuity also is assisted by Lisa Trueblood, who provides bookkeeping and accounting support for the company on a part time basis. Recently, N'Genuity engaged the services of Joe Mancini, a former employee of Quantum Foods, to help grow the company's direct sales to government entities.

24. To avoid any delay or disruption in the payment of wages to its employees as a result of the Chapter 11 filing, N'Genuity paid all accrued wages to employees prior to the Petition Date.

**Sales, Assets and Liabilities**

25. N'Genuity uses a calendar year accounting cycle.

26. N'Genuity's year-to-date sales are marginally over $14,000,000. Largely due to the expense of the Jackson litigation (described below), the company has little net income from operations.

27. As of July 28, 2014, N'Genuity had total assets (at book value) of approximately $2,333,312.88 consisting of: (i) cash of $499,239.06, (ii) accounts receivable of $2,140,388.60, (iii) other current assets of (-$364,656.68), and (iv) personal property and equipment of $27,341.90. N'Genuity does not own any real property.

28. As of July 28, 2014, N'Genuity had total liabilities of approximately

$3,061,209.50.

## History of Dispute With Minority Owner

29. In 1996, I founded the business enterprise that today is N'Genuity. In 2001, N'Genuity was incorporated.

30. As discussed above, N'Genuity qualifies as a small business for federal procurement purposes and has won a number of contract awards as a direct result of that status.

31. Part of Mr. Jackson's role and duties in his capacity as an officer and director of N'Genuity, was to allow the use of, and actively utilize, his name, likeness, and signature in the sale of N'Genuity's products.

32. In and around 2008, at a time when he was being paid by N'Genuity and was acting as an officer and director of N'Genuity, and accordingly owed it various fiduciary obligations, without N'Genuity's knowledge Mr. Jackson entered into promotional agreements for competing businesses, specifically Chick-Fil-A Inc., to utilize his name and likeness in promoting the sale of competing products. His efforts on behalf of competitors included advertisements during college football games broadcast across the nation during holiday periods.

33. Mr. Jackson's activities seriously undermined N'Genuity's business efforts and caused a significant loss in revenue from the sale of N'Genuity's products, including Bo Jackson Signature Food Products such as hamburgers, being sold and branded with his name, signature, or likeness.

34. When confronted with the foregoing, Mr. Jackson undertook a campaign to disrupt N'Genuity's business operations, refused to cooperate with efforts to mitigate the problems he had caused, and generally exacerbated N'Genuity's business problems by commencing litigation and making overreaching demands based on allegations that he had been damaged by N'Genuity's business practices and various actions of N'Genuity's

board of directors and shareholders.

35. Jackson commenced litigation in Illinois that was removed to the Northern District of Illinois. Over the course of almost two years, Jackson engaged in scorched earth litigation tactics in Illinois, in Case No. 1:09-cv-06010 (the "First Illinois Litigation"), asserting damages claims in excess of $17 million against N'Genuity and others.

36. In addition to the significant expense of defending against Jackson's unfounded claims and allegations, Jackson and his counsel also undertook actions to interfere with N'Genuity's business relationships and financial dealings. This interference included, but was not limited to:

    a. Engaging in extensive discussions and correspondence with the Internal Revenue Service, including Jackson's counsel providing more than 150,000 pages of information and misleading aspersions that resulted in the IRS asserting an unfounded and drastically inflated claim of over $2 million against N'Genuity (a claim that the IRS voluntarily reduced by more than half once discovery was completed). The litigation fees incurred by N'Genuity to controvert Jackson's unfounded misrepresentations to the IRS total in the hundreds of thousands of dollars, and continue to date.

    b. Contacting multiple key vendors and customers of N'Genuity to disparage the company and its management.

    c. Corresponding with the Cadle Company and providing confidential information to Cadle with the effect of interfering with settlement efforts and significantly increasing the cost of the Cadle litigation; including Jackson later objecting to the settlement reached with the Cadle Company in the first Bankruptcy Case. The Bankruptcy Court

overruled Jackson's objection.

37. Jackson's relentless litigation campaign, which nearly ground N'Genuity's operations to a halt, was a significant factor in the decision by N'Genuity to file a Chapter 11 Petition on October 11, 2011 (the "2011 Chapter 11 Case") [Case No. 2-11-bk-28705]. Based on Jackson's unfounded allegations, a Chapter 11 trustee was appointed in the 2011 Chapter 11 Case, which added an additional expense of over $750,000 for N'Genuity. Despite the obstacles presented by Jackson (who objected to essentially everything proposed by N'Genuity in the 2011 Chapter 11 Case), N'Genuity managed to confirm a plan of reorganization in roughly five (5) months, and N'Genuity repaid all non-insider claims other than the IRS and Cadle within six (6) months of the effective date of its plan. The administrative portion of the 2011 Case has been closed since approximately November of 2013.

38. Jackson's claims against N'Genuity alleged in the First Illinois Litigation were tried before the Bankruptcy Court over eight days of trial spanning five months in 2012-2013.

39. At the conclusion of trial and post-trial briefing, the Bankruptcy Court awarded Jackson an equitable claim of $500,000 and a 49% minority ownership in the company, a far cry from the $17 million claim that Jackson asserted. In rejecting the vast majority of Jackson's astronomical unsupported claims and allegations, the Bankruptcy Court aptly noted that "[Jackson's] case was marked by testimony and evidence that could never credibly meet the elaborate fraud claims of his papers." *See* Final Order [Dkt. #693] at 99:19-21.

40. Dissatisfied with this result, Jackson unleashed a second litigation assault, suing N'Genuity again in the Northern District of Illinois while simultaneously appealing the Bankruptcy Court judgment to the United States District Court for the District of Arizona. In large measure, Jackson's most recent litigation assault is a carbon copy of

the First Illinois Litigation.

41. Recently, Jackson again moved for "emergency" injunctive relief in the Northern District of Illinois, attempting to cut off N'Genuity's business operations.

42. After the second round of litigation commenced by Jackson, it became apparent that Jackson will stop at nothing to destroy the company and its management. Since Jackson began his "war of attrition," N'Genuity has incurred (conservatively) over $4 million of wasteful litigation related expenses. The company cannot afford another round of litigation with Jackson (which undoubtedly would be followed by another round after than). Accordingly, I authorized this second Chapter 11 Bankruptcy filing in an attempt to fully and finally resolve the crippling disputes that have plagued this company for five years now, and to deal with the inflated claims of the IRS and Cadle that Jackson thrust on N'Genuity as part of his campaign to destroy the company.

43. I regret that innocent creditors may be caught in the cross fire, but the malicious litigation brought by Jackson must end. Through the Chapter 11 process, Jackson will be held accountable for the harm that he has caused N'Genuity and its innocent creditors.

**Events Leading to the Current Chapter 11 Filing**

44. N'Genuity faces a number of challenges that necessitated a Chapter 11 filing.

45. Primarily, the litigation by Mr. Jackson and the attendant business problems and losses caused Jackson, have hampered N'Genuity's efforts to conduct its business. The multimillion dollar claims filed by the IRS and Cadle (largely at Jackson's encouragement) also contribute to the need for Chapter 11 relief for N'Genuity.

46. In light of the ongoing disputes that remain unresolved despite N'Genuity's efforts during the 2011 Chapter 11 Case, I determined that filing a Chapter 11 case would provide N'Genuity with an opportunity to resolve once and for all the Jackson litigation

onslaught and the corresponding claims that it has engendered (like the inflated IRS claim and the Cadle claim).

47. In addition, I am hopeful that the current Chapter 11 filing will assist N'Genuity in resolving any outstanding claims against the company. A sale of N'Genuity, overseen by an independent third party, resulting in a distribution of the funds generated by the sale in accordance with the priority scheme set forth in the Bankruptcy Code, appears to be the most economical approach and appears to be a viable way to halt Jackson's unrelenting litigation assaults. Nevertheless, N'Genuity will explore all available options to maximize recoveries for innocent creditors who have been impacted negatively by the Jackson litigation campaign.

## First Day Motions

48. In order to efficiently administer the Chapter 11 case and accomplish a reorganization of the company that will result in the maximize payment for all creditors and equity holders, N'Genuity immediately will need: (i) authorization to retain Gallagher & Kennedy, P.A. ("G&K") as the company's general bankruptcy and restructuring counsel; and (ii) authorization to retain MCA Financial Group, Ltd. ("MCA") as the company's financial advisor. Accordingly, concurrent with the filing of its Chapter 11 petition, N'Genuity has filed, for the Court's approval on an interim and final basis, several motions and applications (the "First Day Motions") that are necessary to enable N'Genuity to operate in Chapter 11 with a minimum disruption and loss of productivity. N'Genuity respectfully requests that each of the First Day Motions be granted as a critical element in achieving an efficient and successful reorganization of the company. A description of each of the First Day Motions is provided below.

## Applications For Authorization To Retain G&K And MCA

49. N'Genuity requests authorization to employ G&K and MCA as estate professionals (the "Professionals").

50. The professional services that N'Genuity requires, and has requested that G&K perform in the case, include the following:

   a. provide legal advice with respect to N'Genuity's powers and duties as debtor-in-possession in the continued operation of its businesses and management of its property;

   b. prepare on behalf of N'Genuity necessary applications, motions, answers, orders, reports and other legal papers;

   c. appear in Court and protect the interests of N'Genuity before the Court;

   d. assist N'Genuity with loan workouts and with the collection and disposition of N'Genuity's assets, by sale or otherwise;

   e. assist N'Genuity with its ongoing corporate and regulatory legal needs;

   f. represent N'Genuity in any future collection or other litigation commenced (or to be commenced) by and/or against N'Genuity;

   g. assist N'Genuity in preparing and confirming a Chapter 11 plan; and

   h. represent N'Genuity in connection with all aspects of its bankruptcy case and perform all legal services for N'Genuity which may be necessary and proper in these proceedings.

51. The professional services that N'Genuity requires, and has requested that MCA perform in the case, include the following:

   a. advise the Debtor in connection with, and assist in the preparation of, bankruptcy schedules and statement of financial affairs, monthly operating reports, and other financial reporting requirements;

   b. advise the Debtor in connection with, and assist in the preparation of, financial projections;

   c. advise the Debtor in connection with potential and financing issues;

   d. perform financial analysis of the Debtor's business and operations;

11
Case 2:14-bk-11553-PS    Doc 2    Filed 07/28/14    Entered 07/28/14 17:01:14    Desc
Main Document    Page 11 of 12

e. perform M&A and marketing services for the Debtor;

f. advise the Debtor in connection with business and financial restructuring of the company, and in the formulation, negotiation, and confirmation of a Chapter 11 reorganization plan;

g. provide expert witness and litigation support services in relation to cash collateral, financing, valuation, feasibility, and plan confirmation issues; and

h. provide other financial and business consulting services to the Debtor as needed.

52. N'Genuity will ask G&K and MCA (and any other professionals employed in the case) to file interim fee applications to allow N'Genuity, the United States Trustee, creditors and other parties in interest an opportunity to monitor and control the costs and fees of estate Professionals on a current basis.

I declare under penalty of perjury under the laws of the United States of America, that all of the statements that I have made in this Declaration are true and correct to the best of my knowledge, information and belief. If called to testify in this matter, I would testify as stated in this Declaration.

Dated this 28th day of July, 2014.

By: */s/ Valerie M. LittleChief*
Valerie M. LittleChief
President
N'Genuity Enterprises Co.

COPIES of the foregoing were served
this 28th day of July, 2014, via
first-class, U.S. Mail, Email, and/or Facsimile
to the parties on the service list attached to the
Court's copy only.

*/s/ Rachel H. Milazzo*

12
Case 2:14-bk-11553-PS   Doc 2   Filed 07/28/14   Entered 07/28/14 17:01:14   Desc
Main Document    Page 12 of 12